

# IN THE
# TENTH COURT OF APPEALS

### No. 10-11-00457-CR

**PHILLIP WAYNE WALLER,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

### From the 40th District Court
### Ellis County, Texas
### Trial Court No. 35477CR

## MEMORANDUM OPINION

A jury convicted Appellant Phillip Wayne Waller of indecency with a child and assessed his punishment at twenty years' imprisonment and a $10,000 fine. This appeal ensued. In two issues, Waller contends that the trial court erred in denying his motion for directed verdict, which is also a challenge to the sufficiency of the evidence to support the conviction. *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

As limited by the indictment, a person commits the offense of indecency with a child if, with a child younger than seventeen years of age, whether the child is of the same or opposite sex, the person causes the child to engage in sexual contact. TEX.

PENAL CODE ANN. § 21.11(a)(1) (West 2011). "Sexual contact" means any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person, if committed with the intent to arouse or gratify the sexual desire of any person. *Id.* § 21.11(c)(2).

The relevant evidence presented in this case is as follows: Jeffrey M. testified that, on October 12, 2010, he took his seven-year-old son S.M. and four-year-old daughter K.M. to the Walmart in Midlothian to look at toys. As they entered the toy section, Jeffrey saw Waller beside a boy of about eight or nine years old, whom Jeffrey assumed was Waller's son. S.M. wanted to play with the boy, so Jeffrey left him and took K.M. a couple of aisles over to look at the girls' toys. A few minutes later, K.M. needed to use the restroom, so Jeffrey went back over to S.M. and told him that he was going to take K.M. to the restroom. Jeffrey told S.M. to stay there and play with the toys.

Jeffrey testified that he was gone for not more than three to five minutes. Once back in the toy section, he took K.M. back to the girls' toys and told her that he was going to go check on her brother. As he turned onto the aisle where he had left S.M., Jeffrey saw Waller standing behind S.M. Waller had one arm on S.M.'s shoulder and his genital area pressed up and rubbing against S.M. When asked by the prosecutor if Waller was pressed directly against S.M., Jeffrey replied, "From the angle I was at, I couldn't tell exactly. I wasn't from one side, I was from the back, but he was, yes, against him from what I could tell." The prosecutor further asked, "You didn't see any opening between them?" Jeffrey replied, "No." Jeffrey stated that, based on the way

Waller was positioned against S.M. and the motions he was making, he believed that Waller was molesting S.M. for his own sexual gratification.

Jeffrey stated that as soon as he saw them, Waller let S.M. go and started walking toward the back of the store. Jeffrey asked S.M. if Waller had been touching him. S.M. turned around and said "yes." Jeffrey then yelled at Waller and asked him if he was touching S.M. Waller said that he did not touch S.M. Jeffrey then asked Waller why he was touching S.M. According to Jeffrey, Waller "kind of threw his hands" at him and said, "[I]t's not what it looked like. No, it's not what it looked like." Jeffrey said that Waller also grinned like he was excited when he said it. Jeffrey thus struck Waller. When Waller recovered from the blow, he ran. Jeffrey started to give chase, but then turned around and got his children. Jeffrey told employees to call the police because his son had just been molested.

Midlothian Police Department Captain Donald Cole testified that he interviewed Waller after he was arrested. He read Waller his *Miranda* warnings, and Waller agreed to waive his constitutional rights and talk to him. After he and Waller discussed Waller's side of the story of what happened at the Walmart, Waller agreed to provide a signed, written statement. In this statement, Waller said that he had been in the toy section at Walmart. He "bumped into the little boy" and said "excuse me." He then heard Jeffrey call out. Jeffrey was mad and said that Waller had bumped into his child. Waller told him that he was sorry and tried to calm him down, but Jeffrey kept coming toward him. Waller told Jeffrey that he did not intend to hurt or bump into the little boy. Nevertheless, Jeffrey took a swing at him. Waller ducked, turned, and started to

run.  Waller then decided to leave the store.

Captain Cole testified that he continued to interview Waller after he provided the written statement because there were discrepancies between Waller's statement and what other officers had reported to him about what they had discovered during their investigation.  The continued discussion resulted in a second signed, written statement.  In the second written statement, Waller said that there was another boy who was younger than S.M. in the toy section whom he spoke to about Hot Wheels.  Waller stated that while talking to this younger boy, he was "holding my penis with my hand."  When S.M. arrived, the two boys were talking and appeared to know one another.  The younger boy then left, and that is when Waller noticed that S.M. was about the age of the child he was "shopping for or looking at."  Waller saw S.M. looking at some action figures.  Waller stated, "I was holding my penis with my hand at that time, that way if I bumped into him by accident he would not feel my penis."  Waller spoke to S.M.  S.M. had his hand on one of the action-figure packages, and Waller reached out his hand to get the one above.  Waller stated, "The little boy and I were very close and I was touching the boy then and I moved my body down to get a better focus on the action figures."  At some point, Waller left the toy section but returned a few minutes later. He and S.M. were then looking at more action figures.  Waller stated, "I was behind the boy again, very close like before and I was also again holding my penis with my hand because the little boy was being casually friendly."  Waller then heard Jeffrey call for S.M., so Waller walked away from S.M.  That is when Jeffery came at him.  Waller said that his intentions with S.M. were not of a sexual nature but that he could understand

how Jeffrey would think that if he had seen how close Waller was to S.M.

Captain Cole testified that after Waller completed this second written statement, Cole continued to interview Waller, again to address discrepancies. Waller ultimately gave a third signed, written statement. It provides in pertinent part:

> I wanted to make an addition to my first statement by saying I did not tell the truth about this not being sexual in nature. I did not go into Wal-Mart to find a kid. The first kid was a little more friendly then [sic] the second kid. I was looking at the cars with this first kid and as I was bending down to get a better look I accidently bumped into this kid with my penis. When this happened it started me thinking about what it would feel like to be with a guy. This is what got the original thought going on in my head, I was struggling with it.
>
> I was not thinking about being with a kid, just guys in general. I did have a hold of my penis and I thought this kid was too young, I decided to back off this kid before I got anymore aroused. I made sure no further contact was made with the kid.
>
> Then the second kid came into the picture and I was still thinking about being with a guy. I went back to look at the video games and returned to the toy isle [sic] and two boys where [sic] there, the first one that was younger and [an]other boy. These two boys were talking and appeared to know one another.
>
> The younger boy left when someone came to get him and that [was] when I noticed the boy that was left was about the age of the child I was shopping for or looking at. I watched what this boy was looking at and then we moved towards the back isle [sic] of [the] toy section, where I noticed he was looking at some action figures that looked like pieces of candy[.] I was holding my penis with my hand at that time. I took my hand off my penis and went to reach for the toys [we] were looking at. I think my penis may have touched the boy around the lower part of his back, the best I can remember. We continued to look at the toys. I remember that I was holding my penis and my hand touched the boys back area, I am not sure if it was upper or lower back area. The little boy and I were very close and I was touching the boy then and I moved my body down to get a better focus on the action figures. I was still struggling with the thought about being with a guy in general, so I walked over to the Nintendo type games and returned to the toy section a few

> minutes later. The little boy and I were then looking at the green and white action figures. I was behind the boy again, very close like before and I was also again holding my penis with my hand because the little boy was being casually friendly. I heard the little boy's [father] call for him. I walked over to the wrestling action figures and that is when [the] boy's father came at me.

Waller further explained to Cole that "bumping into a boy" was Waller positioning himself behind the boy and slowly and methodically moving his body up and down the back of the child and buttocks area.

Waller first argues that this evidence is insufficient to establish that he intentionally or knowingly caused the child to *touch* his genitals. To support this argument, Waller cites *Deason v. State*, 786 S.W.2d 711 (Tex. Crim. App. 1990), *overruled on other grounds by Gipson v. State*, 844 S.W.2d 738 (Tex. Crim. App. 1992). The *Deason* court held that there was no evidence in the record that the appellant had touched the complainant's vagina when the evidence only showed that the appellant pushed the complainant's panties to the side. *Id.* at 716. The *Deason* court stated: "Thus, there is no evidence that the complainant felt the appellant touch her genitals. In fact, the evidence is replete with evidence to the contrary. Both the complainant and the mother's recall of the complainant's outcry indicate that before touching her genitals, the appellant was interrupted." *Id.*

Waller argues that, like in *Deason*, S.M.'s father did not testify that he saw Waller touching S.M. with his genitals and that there was no testimony from S.M. that he felt Waller touch him with his genitals; therefore, the jury could not find beyond a reasonable doubt that he had touched S.M. with his genitals. But, unlike in *Deason*,

Waller's signed, written statements were admitted into evidence.  In Waller's third statement, he admits, "I took my hand off my penis and went to reach for the toys [we] were looking at.  I think my penis may have touched the boy around the lower part of his back, the best I can remember."  The evidence is thus sufficient to establish that Waller intentionally or knowingly caused S.M. to touch his genitals.

Waller next argues that the evidence is insufficient to establish that he had the intent to arouse or gratify the sexual desire of any person.  The requisite specific intent to arouse or gratify can be inferred from the defendant's conduct, his remarks, and all the surrounding circumstances.  *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981); *Villanueva v. State*, 209 S.W.3d 239, 246 (Tex. App.—Waco 2006, no pet.).  The jury thus could infer from Waller's conduct, his written statements, and all the surrounding circumstances that he had the intent to arouse or gratify his sexual desire.

Viewing all the evidence in the light most favorable to the verdict, we therefore conclude that a rational trier of fact could have found beyond a reasonable doubt that Waller committed the offense of indecency with a child beyond a reasonable doubt.  We overrule both of Waller's issues and affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed

Opinion delivered and filed March 20, 2014
Do not publish
[CR25]